## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMIE L. KHANNA, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. 3:12-cv-2058 |
| v. | : | |
| | : | (JUDGE NEALON) |
| MICHAEL J. ASTRUE[1], | : | (MAGISTRATE JUDGE COHN) |
| Commissioner of Social Security | : | |
| Defendant | : | |

FILED
SCRANTON

DEC - 5 2014

**MEMORANDUM**

PER _____
DEPUTY CLERK

On October 15, 2012, Plaintiff, Jamie L. Khanna, filed an appeal[2] seeking review of the

Commissioner of the Social Security Administration's ("Commissioner") dismissal of her

application for supplemental security income ("SSI") under Title XVI of the Social Security Act,

42 U.S.C. §§ 1381-1385.  (Doc. 1).  On July 29, 2014, Magistrate Judge Gerald B. Cohn issued a

Report and Recommendation ("R&R") recommending that the appeal be denied, and the decision

of the Commissioner denying Plaintiff's application for SSI be affirmed.  (Doc. 15).  Plaintiff

filed objections to the R&R on August 6, 2014.  (Doc. 16).  After de novo review, and for the

reasons set forth below, the R&R will not be adopted.  Instead, the appeal will be granted and the

matter will be remanded to the Commissioner.

---

[1]Carolyn W. Colvin became the Acting Commissioner of the Social Security
Administration ("SSA") on February 14, 2013, and is substituted for Michael J. Astrue as the
Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

[2]Under the Local Rules of Court "[a] civil action brought to review a decision of the
Social Security Administration denying a claim for social security disability benefits" is
"adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

**BACKGROUND**

Plaintiff protectively filed[3] her application for SSI on July 22, 2009, alleging disability beginning October 28, 1997. (Tr. 18).[4]  The application was initially denied by the Bureau of Disability Determination ("BDD")[5] on February 8, 2010. (Tr. 18, 79).  On February 19, 2010, Plaintiff requested a hearing before an administrative law judge. (Tr. 84).  The first hearing was held on December 16, 2010, at which Plaintiff testified, and the proceedings continued at a second hearing on February 9, 2011, at which both Plaintiff and Brian Byerly, a vocational expert ("VE"), testified. (Tr. 31-74).

On February 28, 2011, the administrative law judge ("ALJ") denied the application for SSI, for reasons that will be discussed in more detail herein, concluding that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and that a "finding of 'not disabled' is therefore appropriate." (Tr. 15-26).  On September 12, 2012, the Appeals Council denied Plaintiff's request for review, which meant that the ALJ's decision stood as the final decision of the Commissioner. (Tr. 1).

On October 15, 2012, Plaintiff initiated the above-captioned action. (Doc. 1).  After the parties had fully briefed the appeal, Magistrate Judge Cohn issued an R&R on July 29, 2014, determining that the ALJ's findings were supported by substantial evidence and recommending

---

[3]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[4]References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 17, 2012. (Doc. 9).

[5]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

that the appeal be denied. (Doc. 15). On August 6, 2014, Plaintiff filed objections to the R&R,

along with a supporting brief. (Docs. 16, 17). Defendant's response brief was filed on August

19, 2014. (Doc. 18). The matter is ripe for disposition.

A claimant may be entitled to receive SSI benefits by establishing disability within the

meaning of the Social Security Act. Specifically:

> [t]he law defines disability as the inability to do any substantial gainful activity by
> reason of any medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last for a
> continuous period of not less than 12 months. To meet this definition, you must
> have a severe impairment(s) that makes you unable to do your past relevant work
> or any other substantial gainful work that exists in the national economy. If your
> severe impairment(s) does not meet or medically equal a listing in appendix 1 to
> subpart P of part 404 of this chapter, we will assess your residual functional
> capacity as provided in §§ 416.920(e) and 416.945. We will use this residual
> functional capacity assessment to determine if you can do your past relevant work.
> If we find that you cannot do your past relevant work, we will use the same
> residual functional capacity assessment and your vocational factors of age,
> education, and work experience to determine if you can do other work.

20 C.F.R. § 416.905.

Plaintiff was born in the United States on August 23, 1979; thus, at all times relevant to

this matter she was considered a "[y]ounger person"[6] whose age would not seriously affect her

ability to adjust to other work. 20 C.F.R. § 404.1563(c); (Tr. 37, 49). She completed the

eleventh grade, can read, write, and understand the English language, and has basic math skills.

(Tr. 52). At the time of the first ALJ hearing, she was divorced, and lived with her three-year old

---

[6]The Social Security regulations state that a person age fifty (50) or younger is classified
as "[y]ounger person." 20 C.F.R. § 404.1563(c). The regulations provide: "[i]f you are a
younger person (under age 50), we generally do not consider that your age will seriously affect
your ability to adjust to other work." Id. (citing Rule 201.17 in appendix 2).

son[7] and an older gentlemen she referred to as a father figure to her. (Tr. 49-50, 55). Plaintiff testified that the only money coming in to her and her son was cash assistance and food stamps. (Tr. 51). For approximately one (1) year, she also had a medical card. (Tr. 51). From at least July 22, 2009, until the date of the hearings, she had not performed any work. (Tr. 54). Plaintiff had annual income less than $1,000.00 in 1997, 1999, and 2005, had earnings of $15,390.13 in 2006, and annual income of $2,023.86 in 2007. (Tr. 184-186). No other income was reported. (Tr. 184-186).

Plaintiff testified that since July 22, 2009, she has been unable to work due to depression, anxiety, and "spells along with [her] heart." (Tr. 60) (Counsel's questions "focused only on the period from July 22, 2009, and thereafter."). Plaintiff stated that on a typical day, she would get up, get her son dressed for school, and maybe play with him until the bus arrived. (Tr. 62). She would then go inside, do household chores, and spend time writing, but would not go out anywhere because she would "worry too much of doing anything." (Tr. 63). She stated, "I have problems being able to go out and do things. I don't feel comfortable doing a lot of things like that." (Tr. 60). She testified that she has "trouble dealing and coping with a lot of things on the outside" and that, if not for her son, she probably would be in a hospital. (Tr. 60-61). Plaintiff testified that her anxiety and anger issues make it difficult to work with others and to hold a job, estimating that she would miss work one (1) or two (2) days a week. (Tr. 64-66, 206-207).

Plaintiff provided similar information on the Function Report dated September 16, 2009. (Tr. 201-209) (describing her daily activities and limited outside activities). The Function Report completed by Plaintiff's friend on September 21, 2009, is also consistent. (Tr. 210-217).

---

[7]Plaintiff also has older daughters, who were not living with her. (Tr. 53).

4

**MEDICAL RECORDS**

This Court has conducted de novo review of all the medical records. However, as Plaintiff's appeal issues relate to her mental health conditions, which were affected by a miscarriage, only those records will be summarized herein.

A.    **Records Relating to Plaintiff's Pregnancy and Miscarriage**

On March 21, 2009, Plaintiff went to the Emergency Room at Chambersburg Hospital for complaints of abdominal pain. (Tr. 286-288, 392). She stated that she had a positive pregnancy test four (4) days earlier and an appointment with Keystone Women's Care was scheduled in six (6) days. (Id.). Plaintiff reported that her cramping and low back pain began the previous day. (Id.). The medical reports note that she has a history of bleeding in early pregnancy. (Id.). An OB sonogram identified a single live intrauterine embryo at five (5) weeks, five (5) days gestation, and a small subchorionic bleed adjacent to the sac. (Id.). She was advised to have pelvic rest, with no heavy lifting, and to follow up at Keystone Women's Care as planned. (Id.).

Plaintiff returned to Chambersburg Hospital on April 29, 2009, with vaginal bleeding and cramping. (Tr. 289-292, 391). An OB ultrasound detected a large bleed beneath the placenta in the fundal area. (Id.). She was discharged later that day. (Id.).

On May 21, 2009, Plaintiff went to Chambersburg Hospital with increased vaginal bleeding. (Tr. 293-298, 389-390). An ultrasound was ordered, but she could not wait for the results because she had to pick up her children. (Id. at 297). According to the subsequent Emergency Room Report, the "ultrasound returns revealing [sic] findings concerning for miscarriage" and Plaintiff's diagnosis was listed as "[t]hreatened miscarriage." (Id. at 298).

Plaintiff went to Chambersburg Hospital on May 26, 2009, for a possible miscarriage.

(Tr. 299-301, 387-388).  An OB sonogram revealed normal growth since the previous study and no significant interval change.  (Id.).  She was discharged the same day.  (Id.).

On June 8, 2009, Plaintiff was again treated at Chambersburg Hospital for heavy vaginal bleeding related to her pregnancy at seventeen (17) plus weeks.  (Tr. 258-259).  "She was sent home with a diagnosis of threatened abortion."  (Id.).

Plaintiff returned to Chambersburg Hospital on June 13, 2009, with a second complaint of heavy vaginal bleeding.  (Tr. 258-259, 357-358).  She was admitted for treatment, but discharged home the following day with a recommendation to have strict bed rest.  (Id.).  In the discharge summary, Yvette M. Brown, M.D., noted that "[t]here is no intervention to help abate the bleeding" and that "should delivery occur now [] this is a nonviabl fetus."  (Id.).

Plaintiff was admitted to the Chambersburg Hospital on June 15, 2009, with contractions, pain, and a fever, and it was determined that a miscarriage was in progress.  (Tr. 248-257, 359-360).  The following morning, her "infant delivered spontaneously."  (Id.).  However, the placenta did not separate.  (Id.).  Plaintiff was therefore taken into surgery for its manual removal, and a supracervical hysterectomy had to be performed.  (Id.).  After several days of postoperative care, she was discharged on June 20, 2009.  (Id.).

**B.      Records Relating to Plaintiff's Mental Health Treatment**

On June 10, 2008, Plaintiff was seen by Sumitra Dhanyamraju, M.D., at the Keystone Rural Health Center, seeking a referral for physical therapy following a motor vehicle accident on May 30.  (Tr. 354-355).  The report notes that Plaintiff was previously diagnosed with bipolar disorder and was treated with medications for depression, but had not been taking medication for a couple of years and had reportedly been feeling fine.  (Id.).  Dr. Dhanyamraju opined that no

treatment was needed regarding the pain from the motor vehicle accident, but that Plaintiff needed to be evaluated by a psychiatrist for her depression issues. (Id.).

On November 5, 2009, Plaintiff treated with Dr. Dhanyamraju at Keystone Family Medicine, complaining of feeling anxious and having trouble sleeping. (Tr. 407-409). The medical record notes that earlier in the year Plaintiff lost a baby at twenty-weeks pregnancy. (Id.). It is also noted that Plaintiff was previously diagnosed with bipolar disorder and was on medications in the past, but that she had not been taking any medications for a few years. (Id.). Plaintiff explained that although being advised in June to be evaluated by a psychiatrist/ psychologist, she was unable to do so because she did not have insurance. (Id.). She stated that she was under a lot of stress, but denied feeling depressed or suicidal. (Id.). Dr. Dhanyamraju found "[a]nxiety/history of bipolar disorder and insomnia probably secondary to her underlying psychiatric issues." (Id.). Plaintiff was referred to Keystone Behavioral Health for counseling and started on Hydroxyzine. (Id.).

On November 19, 2009, Plaintiff had an intake appointment with Margaret Copenhaver, Ph.D., LPC, at Keystone Behavioral Health for a psychosocial assessment. (Tr. 496-499, 542-544, 564). The medical record notes that Plaintiff has a long history of hospitalizations, was in several foster homes as a child, suffered physical and sexual abuse, had some traumatic car accidents, and lost a child at twenty weeks in June. (Tr. 564). Plaintiff stated that she gets stressed, cannot take criticism well, and either gets fired or walks off the job. (Id.). She reported having nightmares, flashbacks, startled responses, and difficulty sleeping. (Id.). Dr. Copenhaver opined that Plaintiff has a mood disorder, PTSD, Bipolar II, a Global Assessment of Functioning

("GAF") score[8] of 55, and relationship problems. (Tr. 544, 564). Regarding education/ employment history it is noted that Plaintiff has problems with authority figures and stress. (Tr. 543-544).

On November 20, 2009, Plaintiff saw Dr. Dhanyamraju for a follow-up on her anxiety. (Tr. 405-406). The report states that Plaintiff was seeing a psychologist at Keystone Behavioral Health once a week, who told her to visit Dr. Dhanyamraju to get medication for depression. (Id.). Plaintiff reported that Hydroxyzine did not help to relieve her anxiety or to sleep, and she wanted to try an antidepressant. (Id.). She was assessed as having anxiety/depression, encouraged to continue counseling, and issued prescriptions for Citalopram and Xanax. (Id.).

Plaintiff attended therapy with Dr. Copenhaver on November 25, 2009. (Tr. 563). Dr. Copenhaver reports that she continued the psychosocial assessment and that Plaintiff's background was very complex. (Id.). They discussed Plaintiff's ex-boyfriend, who has a drinking problem, is disrespectful when drinking, and wants to get back into a relationship. (Id.). Dr. Copenhaver noted that they have not approached issues of abuse and that she is "going slowly on this." (Id.). The record states that Plaintiff's "mood was depressed" and her "affect was pretty restricted." (Id.).

---

[8]The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. Diagnostic and Statistical Manual of Mental Disorders, 4th edition, Text Revision (2000). However, "due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed," the "GAF scale appears to have fallen into disfavor" and the American Psychiatric Association has changed the weight an ALJ may accord to a GAF score. See Solock v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-15 (M.D. Pa. 2014) (Carlson, M.J.) (citing Am. Psychiatric Ass'n, Diagnostic and Stat. Manual of Mental Disorders, DSM-5 16 (5th ed. 2013)); Pendergast v. Colvin, 2014 U.S. Dist. LEXIS 131329, *20 (W.D. Pa. 2014). Nevertheless, the 2013 policy has not been applied retroactively. See Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781, *6-7 (E.D. Pa. 2014) (citing Boone v. Barnhart, 353 F.3d 203, 208 n.14 (3d Cir. 2003)).

Plaintiff's next therapy session with Dr. Copenhaver was on December 2, 2009. (Tr. 563). She spoke about her relationship with the father of her two-year-old son. (Id.). He had been deported to Mexico for dealing drugs, following a drug bust in her home. (Id.). He had been physically and verbally abusive. (Id.). Plaintiff also talked about the difficulty in miscarrying her child. (Id.). Dr. Copenhaver noted that Plaintiff has "just scratched the surface of what she has implied has gone on for her entire life," and that her "mood was a bit depressed" and her "[a]ffect was somewhat restricted." (Id.).

On December 8, 2009, Dr. Dhanyamraju treated Plaintiff for her anxiety. (Tr. 403-404). It was noted that Plaintiff had run out of Xanax but continued to take Citalopram on a daily basis. (Id.). Also, Plaintiff was seeing a psychologist at Keystone Behavioral Health on a weekly basis and was still on the waiting list to see a psychiatrist. (Id.). Due to the recent death of her grandfather, Plaintiff was experiencing more anxiety and wanted to have Xanax prescribed again. (Id.). She reported still having problems sleeping at night, but denied suicidal or homicidal ideations. (Id.). Dr. Dhanyamraju assessed Plaintiff as suffering from insomnia and depression/ anxiety, and prescribed medication for each. (Id.).

Plaintiff had a counseling session with Dr. Copenhaver on December 16, 2009. (Tr. 562). Plaintiff reported feeling very depressed and did not think her medications were helping. (Id.). However, Dr. Copenhaver noted that her mood and affect were within normal limits. (Id.).

Plaintiff had a psychiatric evaluation by Ajith Potluri, M.D., at the Keystone Rural Health Center on December 21, 2009. (Tr. 431-434, 538-541). The records note that Plaintiff had been seeing her therapist, Dr. Copenhaver, for two (2) months and was started on medication for her depression by Dr. Sumitra. (Tr. 431). Plaintiff reported, inter alia, feeling depressed, crying all

9

the time, having a lot of anxiety and panic attacks, being tired all the time, feeling overwhelmed with her life, having trouble concentrating, and being easily irritable. (Id.). She stated that she was having anxiety going out in public, going out to get groceries, and needed help from others. (Id.). It was noted that Plaintiff had a very difficult childhood, having been physically and sexually abused in foster homes, had a boyfriend when she was young who shot himself in front of her, had four (4) children out of wedlock from different relationships, and had recently suffered a miscarriage. (Tr. 432-433). Plaintiff explained that for the previous fifteen (15) years she had been taking medications, but was often noncompliant because she was concerned they would cause her to gain weight. (Tr. 432). Dr. Potluri determined that Plaintiff has bipolar disorder type II, chronic PTSD symptoms, generalized anxiety disorder, panic disorder, and a "GAF of around 50 to 55."[9] (Tr. 424). She was advised to continue therapy and issued several medications. (Id.).

Plaintiff had a therapy session with Dr. Copenhaver on December 30, 2009. (Tr. 562). She stated that she was having problems with her ex-boyfriend, that he had come to her house and choked her while she was sleeping, and that the police were called. (Id.). She advised that she did not want to get a PFA. (Id.). The medical record notes that Plaintiff's "mood was euthymic" and her "[a]ffect was a bit restricted." (Id.).

On January 4, 2010, Plaintiff was evaluated by Edward J. Yelinek, Ph.D., of the BDD. (Tr. 420-427). It was noted that Plaintiff has a heart condition, which was diagnosed in 1997.

---

[9] A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Diagnostic and Statistical Manual of Mental Disorders, 4th edition, Text Revision (2000). A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.

(Tr. 420). Plaintiff stated that she has "spells where I'm going to pass out," but was not taking any medication for her condition. (Tr. 421). Dr. Yelinek reported that Plaintiff spoke mostly about a mood disorder and complained about always feeling anxious. (Id.). Plaintiff stated that she would take medication, then feel okay and stop taking it. (Id.). She reported being hospitalized many times, including for a suicide attempt when she was fifteen (15) years old. (Id.). She stated that most of her jobs have been "very short-lived" because she has interpersonal problems with supervisors and co-workers. (Id.). Plaintiff explained that she spends most of her day caring for her two-and-a-half year old son, rarely cooks, and that her roommate does most of the household chores. (Id.). Dr. Yelinek commented that Plaintiff was well-groomed, but appeared depressed. (Tr. 422). The report notes that Plaintiff sleeps poorly, has frequent nightmares, has poor appetite, tires easily, and is socially withdrawn. (Id.). Dr. Yelinek opined that Plaintiff's attention and concentration remain intact, she has average intelligence, her perceptions remain intact, there was no evidence of depersonalization, her thought content appeared appropriate, her memory is variable, and her social judgment is poor. (Id.). The Axis I Diagnostic Impression was listed as major depressive disorder, recurrent, severe; dysthymic disorder; generalized anxiety disorder; and rule out borderline personality disorder. (Tr. 423). Dr. Yelinek determined that Plaintiff's ability to understand, remember, and carry out instructions is slightly to moderately affected by her impairment. (Tr. 426). Her ability to respond appropriately to supervision, co-workers, and the public were found to be markedly limited. (Id.). Further, Dr. Yelinek opined that Plaintiff's ability to respond appropriately to work pressures in a usual setting and to changes in a routine work setting are extremely limited. (Id.).

11

On January 5, 2010, Plaintiff had a follow up appointment with Dr. Potluri. (Tr. 435, 531). She reported feeling the same despite taking the prescribed medications. (Id.). Specifically, Plaintiff "continued to feel hopeless and depressed," "[h]aving more anxiety and panic attacks and nightmares." (Id.). Her dosages were increased, and it was recommended that she continue therapy with Dr. Copenhaver. (Id.).

Plaintiff saw Dr. Copenhaver on January 6, 2010. (Tr. 561). She reported that her anxiety level was "pretty high," that she felt "very depressed," and that she continued to have daily nightmares. (Id.). Dr. Copenhaver commented: Plaintiff "looked very depressed today. Her affect was subdued. She looked very tired and a little groggy." (Id.).

On January 20, 2010, Plaintiff met with Dr. Copenhaver again. (Tr. 560). They discussed Plaintiff's creative writing, her "despair of not being able to trust people or connect," her son, and the fact that she got a PFA against her ex-boyfriend. (Id.). Dr. Copenhaver noted that Plaintiff's "mood was a little down" and her "affect was grim." (Id.).

Plaintiff treated with Dr. Potluri on January 26, 2010. (Tr. 495, 530). She reported that "[a] lot of things happened in the last 3-4 weeks. I have a lot of anxiety." (Id.). As to the reasons for her anxiety, the medical record notes that three (3) weeks prior, Plaintiff's boyfriend physically assaulted her and he was arrested. (Id.). Once released, he tried to attack her again and she had to obtain a PFA. (Id.). Plaintiff complained that since this attack, "she has more symptoms of anxiety, restless feeling, and nightmares." (Id.). Dr. Potluri opined that the medications "do not seem to be helping her" and that Plaintiff "seems not to be get any better and is not happier." (Id.). Her medications were adjusted and she was advised to continue to attend therapy sessions with Dr. Copenhaver, (Id.).

12

On January 27, 2010, Plaintiff had a counseling session with Dr. Copenhaver. (Tr. 559). The report notes that Plaintiff was making good progress and her "affect was more open." (Id.).

On January 28, 2010, Jonathan Rightmyer, Ph.D., completed a Psychiatric Review Technique for Plaintiff based on a records review.[10] (Tr. 436-451). He determined that a residual functional capacity assessment was necessary, based on medical disposition categories 12.04 Affective Disorders, for major depressive disorder, dysthymic disorder, and bipolar II disorder, and 12.06 Anxiety-Related Disorders, for panic disorder, GAD, and PTSD. (Id.). Under the "B" criteria for the categories, he determined that Plaintiff has mild to moderate limitations with no repeated episodes of decompensation. (Id.). Dr. Rightmyer concluded that Plaintiff's understanding and memory is not significantly limited, and her sustained concentration and persistence, her social interaction, and her adaptation is at most moderately limited. (Id.). He found Plaintiff's ability to maintain regular attendance and be punctual, as well as her ability to sustain an ordinary work routine without special supervision, to not be significantly limited. (Tr. 449). Dr. Rightmyer opined that Plaintiff's ability to appropriately respond to changes in the work setting is moderately limited, finding "some limitation in dealing with work stresses." (Tr. 450-451). He determined that Plaintiff "is able to meet the basic mental demands of competitive work on a sustained basis especially in low social demand settings." (Tr. 451). "Based on the evidence of record," Dr. Rightmyer found Plaintiff's statements to be partially credible and Dr. Yelinck's opinion to be without substantial support. (Id.).

---

[10]Dr. Rightmyer noted in his report that there was no treating source opinion in the file. (Tr. 451). See also (Tr. 47) (stating that the State agency "didn't have an [sic] mental health MSS [medical source statement] in the file"). Also, all of the therapy records from Dr. Copenhaver were missing from the record at the time of Dr. Rightmyer's assessment. (Tr. 46-47).

13

At a follow-up medication management appointment with Dr. Potluri at the Keystone Rural Health Center on February 16, 2010, Plaintiff stated that she felt better overall, but anxiety was still an issue. (Tr. 494, 529). It was noted that Plaintiff had been denied social security benefits, that her grandmother recently passed away, and that these, along with being a single mother, were weighing on her mind. (Id.). Dr. Potluri changed her medications and encouraged Plaintiff to stay focused on her therapy with Dr. Copenhaver, (Id.).

Plaintiff had a therapy session with Dr. Copenhaver on February 17, 2010. (Tr. 559). The record notes that Plaintiff's "mood was okay" and her "affect was dull for the most part." (Id.).

On March 3, 2010, Plaintiff met with Dr. Copenhaver again. (Tr. 558). She indicated that she was "feeling very depressed" and "having a lot of trouble with her anxiety." (Id.). The report states that Plaintiff's "mood was depressed" and her "[a]ffect was anxious." (Id.).

On March 16, 2010, Plaintiff treated with Dr. Potluri and reported feeling very anxious and depressed. (Tr. 493, 528). Despite an increase in the dose of Celexa, "she continued to have all the symptoms of anxiety, palpitations, has not seen any improvement...." (Id.). Dr. Potluri opined that "[m]ost symptoms are anxiety related and some depression symptoms." (Id.). Plaintiff was started on medication for her insomnia and anxiety, and an antidepressant. (Id.).

Plaintiff had a therapy session with Dr. Copenhaver on March 17, 2010. (Tr. 558). Plaintiff stated that she had been to a hearing on the charges for Criminal Trespass pending against her boyfriend. (Id.). She also reported having repetitive nightmares. (Id.). Dr. Copenhaver commented that Plaintiff's mood was okay and her "[a]ffect was a little guarded as usual." (Id.).

14

An updated outpatient treatment plan from Dr. Copenhaver at Keystone Behavioral Health dated March 21, 2010, states that Plaintiff's presenting problems were anxiety, depression, and PTSD, and that psychosocial stressors are barriers to treatment. (Tr. 496). The plan notes a GAF score of 55, which was the same GAF score from November 19, 2009. (Tr. 496, 544). Plaintiff signed the plan at her therapy session on March 24, 2010. (Tr. 557). She also talked about a recent incident where a friend, who had been drinking, took her car without permission and totaled the car. (Id.). Dr. Copenhaver noted that Plaintiff's "mood was depressed" and her "[a]ffect was restricted." (Id.).

At an appointment with Dr. Potluri on April 13, 2010, Plaintiff stated that she had "overwhelming anxiety" and was concerned she needed to go to the hospital. (Tr. 492, 527). Although Plaintiff was taking her prescribed medication, she was extremely anxious, jittery, unable to sleep at night, restless, and dizzy. (Id.). Dr. Potluri opined that she was suffering side effects of Abilify. (Id.). This medication was discontinued and other medications were prescribed. (Id.).

On April 20, 2010, Plaintiff had a counseling session with Dr. Copenhaver. (Tr. 557). She was worried about losing her house, and talked mostly about losing a child in a miscarriage. (Id.). It was decided that at the next session, they would start focusing on her issue of anxiety. (Id.). Dr. Copenhaver found that Plaintiff's "mood was depressed" and her "[a]ffect was somewhat restricted." (Id.).

On April 22, 2010, Dr. Potluri treated Plaintiff for follow-up medication management. (Tr. 491, 526). Plaintiff reported "only 30% to 40% improvement in her anxiety level, otherwise she complains that her anxieties are touching the roof." (Id.). Dr. Potluri noted that when he

15

suggested other medications, Plaintiff raised weight concerns, not wanting to take any medications that would cause her to gain weight. (Id.). Her medication dosage was increased and she was advised to continue therapy sessions with Dr. Copenhaver. (Id.).

At a follow-up appointment with Dr. Potluri on May 6, 2010, Plaintiff reported feeling the same despite taking the prescribed medications. (Tr. 489, 525). However, it was noted that Plaintiff's anxiety was related to her ex-boyfriend's possible return following his deportation to Mexico. (Id.). She again expressed concern about taking any medications that might cause her to gain weight, and had certain dosages increased. (Id.).

The following day, Plaintiff met with Dr. Copenhaver. (Tr. 556). Plaintiff talked about her roommate moving out and the childcare issues that would raise for her and her son. (Id.). She stated that she began attending a support group, but that her anxiety was still high and she did not talk much at the meetings. (Id.).

On May 28, 2010, Plaintiff treated with Dr. Potluri. (Tr. 490, 524). Plaintiff advised that over the past few weeks, she had decreased intensity of the anxiety and no severe panic attacks. (Id.). But, Dr. Potluri noted that Plaintiff's anxiety is ongoing, that she has been unsuccessful in keeping a job, and that "currently she's unable to function given her mental health issues." (Id.). He noted some of the difficulties Plaintiff faced during her life. (Id.). Her medication dosage was increased and she was advised to continue therapy sessions with Dr. Copenhaver. (Id.).

On July 9, 2010, Dr. Potluri completed a Mental Impairment Questionnaire (RFC and Listings). (Tr. 481-486, 532-537). Dr. Potluri listed Plaintiff's current GAF score as 55 and noted that her highest GAF in the past year was 50. (Tr. 481). As to Plaintiff's mental abilities and aptitude needed to do unskilled work, he opined that she has moderate to marked limitations.

(Tr. 483-484). Among the activities that he found to be markedly limited are Plaintiff's ability to maintain regular attendance and be punctual, to sustain an ordinary work routine without special supervision, and to deal with normal work stress. (Tr. 484). Dr. Potluri noted that Plaintiff has difficulty dealing with coworkers and supervisors, needs ample timeouts, and angers easily. (Id.). As to Plaintiff's abilities to do semiskilled and skilled work, Dr. Potluri found that Plaintiff has marked limitations, commenting that she never graduated high school and cannot function in such work settings. (Id.). He further opined that Plaintiff has marked limitations in her ability to interact appropriately with the general public and to maintain socially appropriate behavior. (Tr. 185). He concluded that her degree of functional limitations as a result of her mental impairments is marked. (Id.). He anticipated that Plaintiff's impairments would cause her to be absent from work about three (3) times a month. (Tr. 483).

Plaintiff treated with Dr. Potluri on July 9, 2010, for a follow-up medication management appointment. (Tr. 488, 523). It was noted that the prior month, Plaintiff went to the emergency room with severe gastric upset, nausea, and vomiting, but her blood work showed all her levels to be within normal limits. (Id.). She reported that her moods were a little bit more stable than in the past, a decrease in hopelessness and anxiety, and being able to sleep better; but, she felt dizzy and lethargic at times. (Id.). Dr. Potluri directed Plaintiff to continue her medications and her counseling with Dr. Copenhaver. (Id.).

On August 19, 2010, Plaintiff saw Dr. Potluri regarding her "anxiety and behavior disorder." (Tr. 509-512, 519-522). Dr. Potluri opined that she was "doing well but still some anxiety is evident," and adjusted her medications. (Id.). Plaintiff was advised to continue therapy with Dr. Copenhaver. (Id.).

17

Plaintiff had a follow-up appointment with Dr. Potluri on November 19, 2010. (Tr. 515-518, 549-552). She reported "getting more anxious lately." (Tr. 515). The record notes that the date of Plaintiff's disability hearing was approaching, her godmother was sick, and dealing with her son was a "handful." (Tr. 516) (Dr. Potluri commented that he observed Plaintiff's "hyperactive" son at the appointment.). Dr. Potluri opined that he saw some Adult Attention Deficit and hyperactivity symptoms in Plaintiff, as she reported being unable to sit still, focus, and concentrate. (Tr. 517). He commented that Plaintiff "is compliant with medication as prescribed," but there is "[m]inimal improvement." (Tr. 516). Her medications were adjusted. (Tr. 517).

Dr. Potluri treated Plaintiff again on December 17, 2010, at which time she complained that her anxiety was high, although there were no stressors. (Tr. 545-548). Dr. Potluri had Plaintiff complete the ADHD[11] questionnaires and concluded that "she does meet the criteria for ADHD in a severe form." (Tr. 545). He opined that the lack of treatment caused her to be hyperactive and prone to severe anxiety that was not improved with benzos and other SSRI and SNRI medications. (Id.). Despite being compliant with medication, Plaintiff's condition had "[w]orsened." (Tr. 546). Her medication was adjusted. (Tr. 547).

On February 2, 2011, Dr. Copenhaver treated Plaintiff, noting that she was a little anxious and talked non-stop. (Tr. 553-555). Plaintiff explained that she had not been to see Dr. Copenhaver since the previous year "due to transportation problems and child care." (Tr. 554). She described some "irritability at her son's Head Start program because of some minor injuries he sustained" and asked for help with self esteem, feeling safe, and learning to trust her instincts.

---

[11]Attention-deficit/hyperactivity disorder ("ADHD").

(Id.).  The notes state that Plaintiff had been isolating herself and spending a lot of time in her room.  (Id.).

## STANDARD OF REVIEW- R&R

When objections to a report and recommendation have been filed, the court must make a de novo determination of those portions of the report to which specific objections are made. Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989); Goney v. Clark, 749 F.2d 5, 6-7 (3d Cir. 1984).  The written objections must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections."  M.D. Pa. Local Rule 72.3.  The court "may accept, reject, or modify, in whole or in part, the findings and recommendations" contained in the report.  28 U.S.C. § 636(b)(1)(C); Local Rule 72.3.

## STANDARD OF REVIEW- SOCIAL SECURITY APPEAL

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011); Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007).  However, the court's review of the Commissioner's findings of fact is to determine whether those findings are supported by "substantial evidence."  Id.; Green v. Comm'r of Soc. Sec., 266 Fed. Appx. 125, 127 (3d Cir. 2008).  "Where the Administrative Law Judge's findings of fact leading to the Commissioner's decision are supported by substantial evidence, a reviewing court is bound by those findings, even if it would have decided the inquiry differently."  Houser v. Barnhart, 40 Fed. Appx. 670, 671 (3d Cir. 2002).  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting

Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Green, 266 Fed. Appx. at 127;

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). "Substantial evidence is evidence that is

less than a preponderance of the evidence but more than a mere scintilla." Coleman v. Comm'r

of Soc. Sec., 494 Fed. Appx. 252, 254 (3d Cir. 2012) (internal quotations omitted). In an

adequately developed factual record, substantial evidence may be "something less than the

weight of the evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being supported by

substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

On appeal, the district court must decide "whether the ALJ determination adopted by the

Commissioner is supported by 'substantial evidence' on the record as a whole." Chun Soo Hur

v. Barnhart, 94 Fed. Appx. 130, 132 (3d Cir. 2004). The reviewing court has "the 'responsibility

to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not

supported by substantial evidence.'" Richardson v. Barnhart, 136 Fed. Appx . 463, 465 (3d Cir.

2005) (quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)). Substantial evidence exists

only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706

(3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its

weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). "Evidence is not

substantial if the Commissioner failed to consider all relevant evidence or failed to resolve

conflicts created by countervailing evidence." Id. The Commissioner must indicate which

evidence was accepted, which evidence was rejected, and the reasons for rejecting certain

evidence. See Cotter, 642 F.2d at 706-07 (holding that "there is a particularly acute need for

some explanation by the ALJ when s/he has rejected relevant evidence or when there is

conflicting probative evidence in the record").

## SEQUENTIAL EVALUATION PROCESS

To receive SSI, the plaintiff must demonstrate he/she is "unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 20

C.F.R. § 416.905 (defining disability).  Further,

> an individual shall be determined to be under a disability only if his
> physical or mental impairment or impairments are of such severity that he
> is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless of whether
> such work exists in the immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he would be hired if he
> applied for work. For purposes of the preceding sentence (with respect to
> any individual), "work which exists in the national economy" means work
> which exists in significant numbers either in the region where such
> individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process in evaluating disability.  See 20 C.F.R. §

416.920.  This process requires the Commissioner to consider, in sequence, whether a claimant

(1) is engaging in substantial gainful activity, (2) has an impairment that is severe[12] or a

---

[12]An impairment is severe if it significantly limits an individual's physical or mental
ability to do basic work activities. 20 C.F.R. § 416.920. Basic work activities are the abilities
and aptitudes necessary to do most jobs, such as "walking, standing, sitting, lifting, pushing,
pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "[u]nderstanding,
carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding
appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes
in a routine work setting." 20 C.F.R. § 416.921.

combination of impairments that is severe, (3) has an impairment or combination of impairments

that meets or equals the requirements of a listed impairment, (4) has the residual functional

capacity to return to his or her past work, and (5) if not, whether he or she can adjust to other

work in the national economy. Id.

As part of step four, when a claimant's impairment does not meet or equal a listed

impairment, the Commissioner will assess residual functional capacity ("RFC"). See 20 C.F.R. §

416.920. RFC is the individual's maximum remaining ability to do sustained work activities in

an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61

Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time

employment and is defined as eight (8) hours a day, five (5) days per week or other similar

schedule. The RFC assessment must include a discussion of the individual's abilities. Id.; 20

C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity'

is defined as that which an individual is still able to do despite the limitations caused by his or

her impairment(s).").

Using the RFC assessment, the Commissioner will determine whether the claimant can

still perform past relevant work, or can make an adjustment to other work. 20 C.F.R. § 416.945.

If so, the claimant is not disabled; and if not, he is disabled. Id. "The claimant bears the ultimate

burden of establishing steps one through four." Poulos, 474 F.3d at 92 (citing Ramirez v.

Barnhart, 372 F.3d 546, 550 (3d Cir. 2004)). "At step five, the burden of proof shifts to the

Social Security Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the claimant's age,

education, work experience, and residual functional capacity. " Id.

22

**ALJ DECISION**

The ALJ proceeded through each step of the sequential evaluation process and determined that Plaintiff has not been under a disability since July 22, 2009, the date the application was filed.  (Tr. 15-26).

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since July 22, 2009.  (Tr. 20).

At the second step, the ALJ concluded that Plaintiff has the following severe impairments: posttraumatic stress disorder, unspecified bipolar disorder, agoraphobia with panic disorder, and ADHD, predominately Hyperactive-Impulsive.  (Tr. 20).

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20-21).

At step four, the ALJ found that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels," including the mental capacity for occasional dealings with the public and with co-workers.  (Tr. 21).  However, it was determined that Plaintiff is unable to perform any past relevant work.  (Tr. 24).  In assessing RFC, the ALJ considered Plaintiff's testimony and the Function and Disability Reports.  (Tr. 22).  The ALJ determined that Plaintiff's impairments could reasonably cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects were not fully credible.  (Id.).  The decision referred to medical records admitted at the first hearing.  (Tr. 18-26, 48).  The ALJ stated that "significant weight is given to the global assessments of functioning of 50-55," and gave significant weight to the opinion of the state agency psychological consultant, Dr.

Rightmyer. (Tr. 23-24). The ALJ afforded lesser weight to the opinions of Dr. Yelinek and Dr.

Potluri. (Tr. 24). The ALJ found that Dr. Yelinek's assessment, that Plaintiff has marked[13]

restrictions in social functioning and with responding appropriately to work pressures and

changes in routine work settings, overstated her limitations and were based on Plaintiff's

complaints rather than true clinical findings. (Id.). The ALJ rejected Dr. Potluri's opinion that

Plaintiff "is anticipated to be absent from work about three (3) times a month, and has marked

and extreme[14] limitations" in maintaining regular attendance, sustaining an ordinary work routine

without supervision, working closely with/to others without being distracted, completing a

normal workday, accepting instructions, getting along with others, and dealing with normal work

stress. (Id.). The ALJ determined that this opinion was not consistent with the clinical findings,

Plaintiff's daily activities, the fact that she has not required hospitalization, or with a GAF score

of 55. (Id.).

At the fifth step, the ALJ found that jobs Plaintiff can perform exist in significant

numbers in the national economy. (Tr. 25).

Finally, the ALJ concluded that Plaintiff has not been under a disability as defined in the

SSA, and denied the application for SSI benefits. (Tr. 26).

## DISCUSSION

Plaintiff's brief in support of her appeal identified the issues on appeal as follows:

Issue 1: Is the ALJ's assessment of Plaintiff's residual functional capacity for

---

[13]As will be discussed herein, Dr. Yelinek found "extreme" restrictions in some of these areas. See (Tr. 426).

[14]As will be discussed herein, Dr. Potluri did not find that Plaintiff has any "extreme" limitations." See (Tr. 481-486).

work supported by substantial evidence, where the only restrictions reflective of
her mental health impairments are limitations to occasional interaction with the
public and coworkers?
Suggested answer: No.

Issue 2: Is remand warranted based on the failure of the ALJ to discuss or
reference treatment notes from Plaintiff's mental health counselor in her decision?
Suggested answer: Yes.

(Doc. 10, p. 9). Plaintiff argued, <u>inter alia</u>, that the ALJ erred in giving great weight to the state

agency physician, Dr. Rightmyer, and little weight to the opinions of her treating physician, Dr.

Potluri, and consultative physician, Dr. Yelinek. (<u>Id.</u> at pp. 11-16). Plaintiff pointed out that

both Dr. Potluri and Dr. Yelinek found that she has marked limitations in interacting

appropriately with the public, supervisors, and co-workers, as well as handling normal work

stress. (<u>Id.</u> at p. 12). Plaintiff asserted that according to the VE's testimony, these combined

restrictions would preclude employment. (<u>Id.</u>). Additionally, she argued that Dr. Potluri's

finding of marked limitations in maintaining regular attendance and punctuality, in performing at

a consistent pace, and in sustaining an ordinary routine, would preclude all sustained work

activity according to the VE. (<u>Id.</u>). Plaintiff referred to the treating physician rule and contended

that Dr. Potluri's opinion is consistent with the treatment records. (Doc. 10, pp. 13-14). She

claimed that Dr. Yelinek's opinion is also consistent with the medical records, while Dr.

Rightmyer, to whom the ALJ afforded significant weight, did not have access to significant

portions of the records. (<u>Id.</u> at pp. 15-16). Finally, Plaintiff argued that the ALJ erred by failing

to address Dr. Copenhaver's reports, which she claimed are particularly relevant because they are

consistent with the opinions rendered by Dr. Potluri and Dr. Yelinek. (<u>Id.</u> at p. 17); (Doc. 12).

In response, Defendant argued that in determining RFC, the ALJ fully considered

Plaintiff's mental impairments, her activities of daily living, the treatment records, and the opinion evidence. (Doc. 11, pp. 11-20). Defendant asserted that Dr. Potluri's opinion was not entitled to controlling weight in light of the medical evidence, and that the ALJ gave the proper weight to each of the medical opinions. (Id. at pp. 20-23). Defendant contended that although Dr. Rightmyer did not have all the evidence before him when providing his opinion, the ALJ did and her RFC analysis should be affirmed. (Id. at pp. 23-24). Next, Defendant argued that an ALJ is not required to discuss every piece of evidence, that Dr. Copenhaver's therapy notes were not extensive, and that these notes do not detract from the ALJ's decision such that any failure to refer to them was harmless. (Id. at pp. 24-26).

Upon review, Magistrate Judge Cohn determined "that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence." (Doc. 15, p. 21). The R&R recommends that Plaintiff's appeal be denied. (Id. at p. 22).

Plaintiff's objections to the R&R are as follows:

      1. The Magistrate Judge erred in concluding that the RFC assessment by the ALJ adequately addressed all of Khanna's restrictions.

      2. The Magistrate Judge erred in finding that the ALJ properly relied on the State Agency reviewer's opinions, rather than those of the treating psychiatrist and consultative examiner.

      3. The Magistrate Judge erred in concluding that the ALJ's failure to directly reference the treatment records of Dr. Copenhaver constituted harmless error.

(Doc. 16); see also (Docs. 17-18).

This Court will conduct de novo review.

## A.    RFC

As to the RFC assessment, Plaintiff asserts that the "Magistrate Judge quotes extensively from the ALJ's decision as support for the proposition that the decision is supported by substantial evidence. Khanna contends, however, that it is what the ALJ did not include in her decision that renders it defective." (Doc. 17, p. 3). Specifically, she claims that the ALJ failed to address restrictions regarding "interactions with supervisors; ability to handle work stress; ability to attend work on a regular basis without excessive tardiness or work absences; ability to handle changes in a routine work setting and ability to maintain adequate attention and concentration." (Id. at p. 4). She asserts that the ALJ's restriction, to occasional interaction with the public and coworkers, does not adequately address Plaintiff's limitations. (Doc. 10, p. 12). Further, Plaintiff contends that the ALJ included a limitation to unskilled work during her examination of the VE, but her decision does not include such limitation. (Id.).

In discussing the medical records, the ALJ found that Plaintiff's attention and concentration are intact. (Tr. 23). Further, the ALJ considered the opinions of Dr. Yelinek and Dr. Potluri regarding the degree to which Plaintiff's abilities to respond appropriately to work pressures and changes in usual and routine work settings, to maintain regular attendance, to accept instructions and respond appropriately to supervisors, and to deal with normal work stress are affected by her mental health impairment. (Tr. 24), citing (Tr. 420-427, 481-487). Although the ALJ's decision did not include a thorough analysis of each limitation, the ALJ did address the restrictions identified by Plaintiff in her objections.

However, the ALJ's limited discussion of Plaintiff's abilities/inabilities was primarily provided in the context of the weight being afforded to the medical source opinions. See (Tr. 22-

24).  For reasons more fully set forth in the section below, the ALJ erred in weighing these opinions.  "This error alone would be sufficient to undermine the ALJ's RFC determination." Heise v. Astrue, 2010 U.S. Dist. LEXIS 78089, *26 (D.N.J. 2010) (citing 20 C.F.R. § 404.1527(d)(2); Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986)).  Notably, Dr. Potluri, whose opinion was given little to no weight, found that Plaintiff's ability to maintain regular attendance and be punctual, to sustain an ordinary work routine without special supervision, and to deal with normal work stress was markedly limited.  (Tr. 484).  At the ALJ hearing, when the VE was asked to consider that the hypothetical individual with Plaintiff's vocational profile also had a frequent inability to deal with normal work stress, the VE found it would "exclude the individual's ability to perform any employment."  (Tr. 42).  Similarly, the VE concluded that if the individual had a "frequent inability to maintain regular attendance and punctuality and sustain an ordinary routine," it would "exclude the individual's ability to maintain employment."  (Tr. 43).  To the extent these restrictions would preclude Plaintiff's ability to adjust to other work and because the ALJ's decision to reject Dr. Potluri's opinion is not supported by substantial evidence, the RFC assessment cannot stand.  See Carothers v. Comm'r of Soc. Sec., 2009 U.S. Dist. LEXIS 89638, *30-31 n.34 (W.D. Pa. 2009) ("[T]he ALJ's error in failing to give controlling weight to the opinion of Dr. Kalenak resulted in an RFC assessment that did not include all of his work-related limitations.  In turn, the VE's testimony in response to the hypothetical question which was based on the inadequate RFC assessment does not constitute substantial evidence supporting the ALJ's decision.").

Moreover, there are several additional errors in the RFC.  Specifically, although the ALJ mentioned Dr. Rightmyer's conclusion that Plaintiff "is able to meet the basic mental demands of

competitive work on a sustained basis[15] especially in low social demand settings," (Tr. 451), the

RFC finding does not include any limitation to low social demand settings.  (Tr. 22).  Because

the ALJ afforded significant weight to this opinion, and in light of the opinions offered by Dr.

Yelinek and Dr. Potluri finding marked restrictions in this area, see (Tr. 426, 484-485), the ALJ's

decision not to include this limitation in the RFC, or to explain the reasons for rejecting it, was in

error.  See Kirkland v. Colvin, 2014 U.S. Dist. LEXIS 38701, *25 (M.D. Pa. 2014) (Conner,

C.J.) (remanding the matter to the ALJ because he "may not reject pertinent or probative record

evidence without providing an explanation for doing so"), citing Johnson v. Comm'r of Soc.

Sec., 529 F.3d 198, 204 (3d Cir. 2008); Cotter, 642 F.2d at 707; See also Emerick v. Astrue,

2013 U.S. Dist. LEXIS 55242, *9-10 (W.D. Pa. 2013) (holding that the ALJ's failure to include

limitations in the RFC found by the state agency psychologist to whom he afforded significant

weight warranted remand for further consideration and discussion).

Additionally, the ALJ's failure to include in the RFC a limitation to unskilled work,[16] or

to explain why it was not included, was in error.  Considering Plaintiff's RFC, the ALJ

determined that Plaintiff could not perform any past relevant work.  See 20 C.F.R. §

---

[15]The basic mental demands of competitive, remunerative, unskilled work include
the abilities (on a sustained basis) to understand, carry out, and remember simple
instructions; to respond appropriately to supervision, coworkers, and usual work
situations; and to deal with changes in a routine work setting. A substantial loss of
ability to meet any of these basic work-related activities would severely limit the
potential occupational base. This, in turn, would justify a finding of disability
because even favorable age, education, or work experience will not offset such a
severely limited occupational base.

1985 SSR LEXIS 20 (SSR 1985).

[16]"Unskilled work is work which needs little or no judgment to do simple duties that can
be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).

416.920(a)(4)(iv) ("At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work."); (Tr. 24). The ALJ stated simply that Plaintiff's previous occupation required "semi-skilled work[17] tasks at the sedentary level of exertion" and, "[a]ccordingly, the claimant is unable to perform past relevant work." (Tr. 24) (citing the VE's testimony). Other than the fact that Plaintiff's past relevant work as a reception clerk was "semi-skilled," the ALJ offered no explanation for finding that Plaintiff could no longer perform this work; therefore, it appears[18] that it was the skill level that was determinative. See 1983 SSR LEXIS 30 (SSR 1983) (The Glossary of terms defines "Skill Level" as a "work classification whereby work is defined according to skill requirements."). The ALJ's questions to the VE also limited Plaintiff to "unskilled work." (Tr. 39-41). Further, the ALJ accorded significant weight to the opinion of Dr. Rightmyer, who found that Plaintiff "is able to carry out very short and simple instructions" and that she can function in "jobs requiring little independent decision making." (Tr. 451). Dr. Rightmyer's assessment essentially limits Plaintiff to unskilled work. See Santore v. Astrue, 2010 U.S. Dist. LEXIS 145805, *19-20 (E.D. Pa. 2010) (finding that the RFC limiting the claimant "to work that does not involve detailed instructions or more than 1-2 step tasks is essentially a limitation to unskilled work"). See also (Tr. 483-484) (Dr. Potluri opined that Plaintiff has moderate to marked limitations in her ability to do unskilled work, and

---

[17]"Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities...." 20 C.F.R. § 404.1568(b).

[18]"There are cogent reasons why an administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests. Chief among them is the need for the appellate court to perform its statutory function of judicial review." Cotter, 642 F.2d at 707.

marked limitations in her abilities to perform semiskilled and skilled work).  Consequently, the

ALJ's decision, which does not include this non-exertional limitation in the RFC or explain why

it was rejected, is not supported by substantial evidence.  See Cline v. Comm'r of Soc. Sec., 2014

U.S. Dist. LEXIS 134146, *11-12 (W.D. Pa. 2014) (remanding for further explanation as to why

the RFC finding did not include restrictions offered by two state reviewing agents, which

"possibly conflict with the ALJ's determination of the RFC and his finding that Plaintiff could

perform her past relevant work"); Lokay v. Astrue, 2011 U.S. Dist. LEXIS 72005, *8 (W.D. Pa.

2011) (remanding the case "so that the ALJ can explain why he gave substantial weight to Dr.

Mortimer's opinion, yet failed to include in the RFC Finding the non-exertional limitations Dr.

Mortimer identified").

  Accordingly, this matter will be remanded to the ALJ to conduct a new RFC assessment.

  **B.**  **Weight Afforded to the Medical Opinions**

  Plaintiff asserts that although she addressed the "treating physician" rule at length in her

brief supporting the appeal, the "Magistrate Judge, again, quotes extensively from the ALJ's

decision in support of his conclusion that the decision was appropriate." (Doc. 17, p. 5).  She

argues that the ALJ failed to provide sufficient reasons to reject the restrictions offered by Dr.

Potluri and Dr. Yelinek, especially because the limitations are consistent with these doctors'

observations of Plaintiff, with the repeated adjustments to medication, and with the medical

records.  (Id. at pp. 5-10).  She notes that Dr. Rightmyer never examined or treated Plaintiff, and

did not have access to all the medical records.  (Id.).

  In response to the objections, Defendant contends that the opinions of Dr. Yelinek and

Dr. Potluri were not entitled to controlling weight in light of the medical evidence.  (Doc. 18, p.

31

5).  Defendant asserts that the ALJ did not reject the opinions outright, and adequately explained

why he gave less weight to these doctors' findings.  (Id. at pp. 5-8).  As to Dr. Rightmyer,

Defendant argues that his opinion is well supported by the record, and that although he did not

have all the evidence before him, the additional records do not show an increase in the severity of

Plaintiff's mental impairments as to render his opinion inconsistent with the record as a whole.

(Id. at pp. 8-9).

     A treating source's opinion will be given controlling weight if it is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record."  See 20 C.F.R. § 416.927(c).  "Federal courts

repeatedly have held that a diagnosis need not be based on 'objective' evidence to be 'medically

acceptable.'"  Dones v. Barnhart, 2002 U.S. Dist. LEXIS 20322, *22 (E.D. Pa. 2002)

(determining that there is no requirement that an impairment be proven by "objective" evidence,

and noting that the treating physician's assessment was based on his clinical treatment of the

plaintiff over a period of five (5) months).  If the treating source's opinion is not given

controlling weight, the ALJ must consider all of the following factors in deciding the weight to

be given: (1) examining relationship; (2) treatment relationship;[19] (3) supportability; (4)

consistency; (5) specialization; and (6) other factors.  See 20 C.F.R. § 416.927(c).  The Third

Circuit Court of Appeals has explained:

> A cardinal principle guiding disability eligibility determinations is that the ALJ
> accord treating physicians' reports great weight, especially "when their opinions
> reflect expert judgment based on a continuing observation of the patient's

---

[19]The treatment relationship factor requires the ALJ to consider the frequency of
examination and the length, nature, and extent of the treatment relationship.  See 20 C.F.R. §
416.927(c)(2).

condition over a prolonged period of time." Plummer, 186 F.3d at 429 (quoting
Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)); see also Adorno v.
Shalala, 40 F.3d 43, 47 (3d Cir. 1994); Jones, 954 F.2d at 128;[20] Allen v. Bowen,
881 F.2d 37, 40-41 (3d Cir. 1989); Frankenfield v. Bowen, 861 F.2d 405, 408 (3d
Cir. 1988); Brewster, 786 F.2d at 585. Where, as here, the opinion of a treating
physician conflicts with that of a non-treating, non-examining physician, the ALJ
may choose whom to credit but "cannot reject evidence for no reason or for the
wrong reason." Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d
1058, 1066 (3d Cir. 1993)). The ALJ must consider the medical findings that
support a treating physician's opinion that the claimant is disabled. See Adorno,
40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ
may not make "speculative inferences from medical reports" and may reject "a
treating physician's opinion outright only on the basis of contradictory medical
evidence" and not due to his or her own credibility judgments, speculation or lay
opinion. Plummer, 186 F.3d at 429; Frankenfield v. Bowen, 861 F.2d 405, 408
(3d Cir. 1988); Kent, 710 F.2d at 115.[21]

Morales, 225 F.3d at 317-18.

In the instant action, it is initially noted that the ALJ should have discussed these

standards, but did not. See Morris v. Astrue, 2012 U.S. Dist. LEXIS 31898, *56 (D. Del. 2012)

(finding that the "ALJ erred in failing to address or discuss any of the legal standards set forth

above regarding the weight to be given to a treating physician's opinion"). Inter alia, the ALJ

failed to consider the examining relationship and the treatment relationship. See (Tr. 18-26).

### 1.    *Dr. Rightmyer*

In affording "significant weight" to the opinion of Dr. Rightmyer, the ALJ explained that

"it is well supported by the examination findings, the limited treatment history, and the

claimant's situational stressors." (Tr. 24). However, at the time Dr. Rightmyer completed the

Psychiatric Review Technique, he did not have all the "examination findings" or a complete view

---

[20]Jones v. Sullivan, 954 F.2d 125 (3d Cir. 1991).

[21]Kent v. Schweiker, 710 F.2d 110 (3d Cir. 1983).

of Plaintiff's "treatment history," which included ten (10) more appointments with Dr. Potluri and fifteen (15) total sessions with Dr. Copenhaver, eight (8) of which pre-dated Dr. Rightmyer's opinion. See Cadillac v. Barnhart, 84 Fed. Appx. 163, 168-69 (3d Cir. 2003) (finding that the ALJ's decision to rely on the State Agency physicians could not stand because it "was error for the ALJ to have favored medical opinions based on an incomplete record over those based on the complete record"); Burns v. Comm'r of Soc. Sec., 2008 U.S. Dist. LEXIS 42190, *32-33 (W.D. Pa. 2008) (finding that the ALJ erred in according greater weight to the opinion of the State agency psychological consultant than the treating physician because the former was based on an incomplete record); (Tr. 428-576).  Dr. Rightmyer noted that at the time of his records review, which pre-dated the ALJ hearings by approximately one (1) year, there was no treating source opinion ("TSO") in the file.  (Tr. 451).  See Chandler v. Colvin, 2014 U.S. Dist. LEXIS 132990, *38 (M.D. Pa. 2014) (Conaboy, J.) (concluding that the "State agency assessments cannot stand for the broad proposition that Plaintiff's symptoms were found to be substantiated by the medical evidence and no evidence is inconsistent with Dr. Wehman's limitations," because "the assessments did not include ALJ hearing testimony and the treatment records and Medical Source Statement from Dr. Wehman").  By the time of her decision, however, the ALJ had all the medical records, including a contradictory opinion from Plaintiff's treating source.  The Third Circuit Court of Appeals "has 'consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician,'" Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 357 (3d Cir. 2008) (holding that the ALJ's decision to adopt the opinion of Dr. Rightmyer, a non-examining psychologist, over the plaintiff's treating physicians was an

error), quoting Dorf v. Bowen, 794 F.2d 896, 901 (3d Cir. 1986). Therefore, for reasons more fully discussed below, this Court concludes that the ALJ's decision to place "significant weight" on Dr. Rightmyer's opinion is not supported by substantial evidence. See Brownawell, 554 F.3d at 357 (holding that "Dr. Rightmyer's assessment, which was the only one adopted unreservedly by the ALJ, should not have carried such great weight, especially when compared to the opinion of [the plaintiff's] longtime treating physician").

### 2.     *Dr. Yelinek*

In affording lesser weight to Dr. Yelinek's opinion, the ALJ determined that while his assessments of "slight and moderate restrictions are generally supported by the medical record as a whole," "the marked findings clearly overstate the claimant's limitations and appear to be based on [her] complaints/allegations rather than true clinical findings."[22] (Tr. 24). But, "the ALJ must give a claimant's complaints great weight absent contradictory medical evidence, and must provide an adequate basis for disregarding those complaints." Simmler v. Barnhart, 2007 U.S. Dist. LEXIS 16915, *44 (E.D. Pa. 2007). "Physicians who treat patients for physical ailments can sometimes 'formulate medical opinions based upon objective findings derived from clinical tests.' Psychiatrists, on the other hand, typically treat the 'subjective symptoms' described by their patients." Belajac v. Astrue, 2011 U.S. Dist. LEXIS 108926, *21 (W.D. Pa. 2011), citing Morales, 225 F.3d at 319-20.

In error, the ALJ discussed only the medical records favorable to her conclusion. See Irizarry v. Barnhart, 233 Fed. Appx. 189, 192-93 (3d Cir. 2007) (remanding because the ALJ did

---

[22]Clinical findings include the results of mental status examinations. See 20 C.F.R. § 416.913(b)(2).

not discuss all of the relevant evidence or explain his rejection of certain medical evidence).  It is improper for an ALJ to pick and choose which evidence to cite.  See Middlemas v. Astrue, 2009 U.S. Dist. LEXIS 19090, *29-30 (W.D. Pa. 2009) (explaining that an ALJ may not "'pick and choose' among the evidence, selecting only that which supports his ultimate conclusions"), citing Morales, 225 F.3d at 318 (finding error in the ALJ's decision to ignore relevant medical evidence and draw his own medical conclusion based on "pieces of the examination reports that supported this determination").

First, in discussing the medical records from "November 2009," the ALJ stated: "it is noteworthy that [Plaintiff] reported going through a lot of stress but did not feel depressed...." (Tr. 23).  While this is true for her appointment with Dr. Dhanyamraju on November 5, 2009, Plaintiff saw Dr. Dhanyamraju again on November 20, 2009, and reported that she was told to get medication for depression by her psychologist.  (Tr. 405-409).  See also (Tr. 564) (Dr. Copenhaver noted that on November 19, 2009, Plaintiff presented "with depression," and opined that Plaintiff's "mood was depressed."); (Tr. 563) (In Dr. Copenhaver's notes from a therapy session on November 25, 2009, she reported that Plaintiff's "mood was depressed.").  Dr. Dhanyamraju assessed Plaintiff as having "Anxiety/depression," encouraged her to continue counseling, and started her on medication.  (Tr. 405).

Next, the ALJ referred to Plaintiff's treatment in December 2009.  (Tr. 23).  The ALJ cited to portions of Dr. Potluri's notes where he described Plaintiff as cooperative, well oriented, able to make eye contact, and showing no evidence of flight of ideas or hallucinations.  (Id.). But, the ALJ did not mention that the notes from the same day also state that Plaintiff complained of feeling depressed, having trouble concentrating, being easily irritable, and "having

36

a lot of anxiety going out into the public." See (Tr. 431) (notes from December 21, 2009). The ALJ also failed to discuss Plaintiff's treatment with Dr. Dhanyamraju on December 8, 2009, or any of her three (3) therapy sessions with Dr. Copenhaver in December 2009. Medical reports from all four (4) appointments note Plaintiff's depression. See (Tr. 403-404, 562-563).

The ALJ then referred to a "subsequent progress note from Keystone Rural Health Center" showing that Plaintiff reported no improvement with medications, and had her medications increased. (Tr. 23). The ALJ mentioned that Plaintiff was advised to have at least a 500-calorie meal with the medication, and that her "increased anxiety was secondary to her abusive ex-boyfriend's possible return from Mexico." (Id.). Upon review, it appears that the ALJ was referring to Dr. Potluri's notes from January 5, 2010, and May 6, 2010. (Tr. 435, 525). The ALJ also cited a psychiatric source statement from July 2010, which noted that Plaintiff's GAF had improved to 55 with changes in her medication. (Tr. 23), citing (Tr. 481-486).

Erroneously, the ALJ did not address any of the other treatment Plaintiff received during this seven (7) month period.[23] This medical evidence includes seven (7) other appointments with her treating physician, Dr. Potluri, and nine (9) therapy sessions with Dr. Copenhaver. See (Tr. 556-561). The medical records section above details this treatment and it will not be repeated. However, it is worth noting that at each of Plaintiff's seven (7) appointments with Dr. Potluri, she complained of anxiety. See (Tr. 488-495). Plaintiff's other reported symptoms included, inter alia, restlessness, nightmares, depression, insomnia, and dizziness. (Id.). At all but one (1)

---

[23]As to the psychiatric source statement, which noted that Plaintiff's GAF had improved to 55, it also reported that Plaintiff's mental abilities and aptitude needed to do unskilled, semiskilled, and skilled work were moderately to markedly limited, and that her functional limitations were marked. (Tr. 481-486).

of these appointments, on July 9, 2010, Dr. Potluri changed Plaintiff's medications in type and/or dose in an attempt to alleviate her symptoms. See (Tr. 488, 523). Furthermore, throughout 2010, Dr. Potluri adjusted Plaintiff's medications eleven (11) times. See (Tr. 435, 489-495, 509-512, 517, 547) (reflecting medication changes on January 5, 2010, January 26, 2010, February 16, 2010, March 16, 2010, April 13, 2010, April 22, 2010, May 6, 2010, May 28, 2010, August 19, 2010, November 19, 2010, and December 17, 2010). However, the ALJ's decision mentions only one (1) such instance. See Dominguez v. Astrue, 2012 U.S. Dist. LEXIS 114049, *35 (W.D. Pa. 2012) (remanding because the ALJ failed to discuss, inter alia, that the claimant's medications were consistently changed and increased throughout his treatment); 1996 SSR LEXIS 4, 20-21 (SSR 1996) ("Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, ... may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms."). Further, on May 28, 2010, Dr. Potluri opined that despite Plaintiff's medication compliance and the absence of any severe panic attacks in a few weeks, she was "unable to function given her mental health issues." (Tr. 490).

Finally, the ALJ discussed "[m]ore recent notes from Keystone Health," specifically Dr. Potluri's report from August 19, 2010. (Tr. 23). The ALJ stated that Plaintiff "reported feeling 'pretty good,' *managing well* with her medications, sleeping at least *5 hours without waking*, and exhibited appropriate speech and affect, intact memory and only a mildly anxious mood." (Id.) (emphasis added), citing (Tr. 509-512). This is not an accurate account of these notes. Rather, Plaintiff reported feeling "Pretty good, *little anxious lately, but managing* with my anxiety medication." (Tr. 509) (emphasis added). She stated, "sleep so, so. at least *5 hours but wakes up*

38

*in the middle.*" (Id.) (emphasis added). Dr. Potluri found that her "mood is anxious and mild anxiety." (Tr. 510).

The ALJ's decision, dated February 28, 2011, failed to address Plaintiff's even "more recent" treatment with Dr. Potluri on November 19, 2010, and December 17, 2010. (Tr. 515-518, 545-552). See also (Tr. 553-555) (Dr. Copenhaver's treatment notes from February 2, 2011, stated that Plaintiff "was a little anxious today and talked non-stop."). In November 2010, Plaintiff reported "getting more anxious lately," which Dr. Potluri found could be connected to, inter alia, the upcoming disability hearing. (Tr. 515). However, he also opined that he saw some Adult Attention Deficit and hyperactivity symptoms in Plaintiff, as she reported being unable to sit still, focus, and concentrate, and found "[m]inimal improvement" with the prescribed medication despite Plaintiff's compliance. (Tr. 516-517). On December 17, 2010, Plaintiff reported that her "anxiety is high." (Tr. 545). Dr. Potluri had Plaintiff complete the ADHD questionnaires and concluded that "she does meet the criteria for ADHD in a severe form." (Id.). He opined that the lack of treatment caused her to be hyperactive and prone for severe anxiety, that was not improved with benzos and other SSRI and SNRI medications. (Id.). The ALJ's failure to discuss these records is particularly troubling because under the second step of the sequential evaluation process the ALJ found that Plaintiff suffers from the severe impairment of ADHD, predominately hyperactive-impulsive. (Tr. 20). This impairment was first diagnosed by Dr. Potluri on December 17, 2010. (Tr. 547).

Additionally, as will be discussed in greater detail below, the ALJ's decision and recitation of the medical records completely failed to mention Plaintiff's treatment with Dr. Copenhaver or any of the notes from their fifteen (15) therapy sessions.

39

This Court recognizes that the ALJ need not discuss every piece of relevant evidence. See Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001). But, she also may not pick and choose to cite only the evidence that supports her conclusion. See Irizarry, 233 Fed. Appx. at 192-93. Accordingly, in the absence of contradictory medical evidence, Plaintiff's complaints are entitled to great weight, see Simmler, 2007 U.S. Dist. LEXIS 16915 at *44, and the ALJ's reason for discounting Dr. Yelinek's "marked findings"[24] are not supported by substantial evidence. See Jury v. Colvin, 2014 U.S. Dist. LEXIS 33067, *28 (M.D. Pa. 2014) (Conner, C.J.) (concluding that the ALJ's decision to discount the treating physician's opinion in the RFC assessment was not supported by substantial evidence because, inter alia, "[i]t is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence") (internal quotations omitted).

### 3.    Dr. Potluri

As to the weight afforded to Dr. Potluri, the ALJ determined that his opinion that Plaintiff "is anticipated to be absent from work about three times a month," and "has marked and extreme[25] limitations in maintaining regular attendance, sustaining an ordinary work routine

---

[24]The ALJ stated that Dr. Yelinek assessed Plaintiff with a "marked restriction with responding appropriately to work pressures and changes in usual and routine work settings;" however, Dr. Yelinek actually opined that she had "extreme" limitations in these areas. Compare (Tr. 24), with (Tr. 426). This Court cannot determine if the ALJ mistakenly commented that Dr. Yelinek found marked limitations or if she missed his findings of extreme limitations. See Cotter, 642 F.2d at 705 (holding that an "ALJ cannot reject evidence for no reason or the wrong reason").

[25]Contrary to the ALJ's decision, Dr. Potluri did not find that Plaintiff has "extreme" limitations in performing any activity. (Tr. 481-486). The form defines "marked" as a "serious limitation" where the "ability to function is severely limited but not precluded." (Tr. 483). An "extreme" limitation is described as a "major limitation" such that "[t]here is no useful ability to function." (Id.). As with the ALJ's description of Dr. Yelinek's assessment, this Court cannot

40

without supervision, working in coordination with or proximity to others without being unduly

distracted, completing a normal workday, accepting instructions, getting along with coworkers

and peers, dealing with normal work stress, interacting appropriately with the general public and

maintaining socially appropriate behavior," was not consistent with, inter alia, the clinical

findings, Plaintiff's ability to care for herself and her son without help, her ability to go out alone,

drive, and not need reminders to perform daily activities, the fact that Plaintiff has not required

hospitalization, or with a GAF score of 55.  (Tr. 24).

"[A]ffording a treating source little weight is atypical."  Millard v. Comm'r of Soc. Sec.,

2014 U.S. Dist. LEXIS 15420, *4 (W.D. Pa. 2014) (denying appeal).  Furthermore, the Third

Circuit Court of Appeals has admonished ALJs who discount a doctor's opinion because it is

inconsistent with the evaluation and with the clinical signs and findings in the medical record,

"noting the distinction between a doctor's notes for purposes of treatment and that doctor's

ultimate opinion on the claimant's ability to work."  Brownawell, 554 F.3d at 356-57 (finding

that the ALJ's rejection of the treating physician's opinion that the plaintiff had "no ability to

deal with work stresses and maintain concentration in a work environment was improperly based

on an alleged inconsistency between [the doctor's] treatment notes and his ultimate evaluation").

A plaintiff's ability to perform many household chores also "does not supply the grounds

for dismissing the treating psychologists' opinions."  Natale v. Comm'r of Soc. Sec., 651 F.

---

determine if the ALJ mistakenly commented that Dr. Potluri found extreme limitations or if she
mistakenly believed that he did and factored that mistaken belief into the decision to accord
lesser weight to the opinion.  See Cotter, 642 F.2d at 706 (holding that "the ALJ cannot reject
evidence for ... the wrong reason"); Weinsteiger v. Astrue, 2010 U.S. Dist. LEXIS 5971, *18-19
(E.D. Pa. 2010) (remanding to the ALJ where the "the ALJ's decision to reject the opinion of
[the treating physician] is predicated, at least in part, on a mistake of fact").

Supp. 2d 434, 454 (W.D. Pa. 2009). "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) (finding that "the sporadic and transitory nature of Smith's activities [he had full use of his hands, arms and legs, does shopping and last fall went hunting twice] demonstrate not his ability but his inability to engage in substantial gainful activity"). Here, the ALJ determined that Plaintiff has only mild restrictions in activities of daily living, stating that Plaintiff is "able to care for herself and her son, is able to cook, clean, shop, drive, and go out without difficulty." (Tr. 21, 24), citing (Tr. 201-208). However, in the Function Report dated September 16, 2009, which the ALJ cites for support, Plaintiff also stated that she only goes out "when necessary," that she not drive a lot, and that she has "problems dealing with people." (Tr. 201-208). See also (Tr. 210-217). Similarly, on December 16, 2010, Plaintiff testified that she has "problems being able to go out and do things," "trouble dealing and coping with a lot of things on the outside" and that, if not for her son, she probably would be in a hospital. (Tr. 60-61). Accordingly, the evidence cited does not support the ALJ's finding in this regard.

As to the ALJ's determination that a GAF "score of 55 is internally inconsistent with [Dr. Potluri's] *very* severe mental assessment ratings," (Tr. 24) (emphasis added), it is once again[26] unclear as to whether the ALJ rejected Dr. Potluri's opinion for "the wrong reason." See Cotter, 642 F.2d at 706. Dr. Potluri found "marked" limitations, which describe the ability to function as "severely limited," but found no "extreme" limitations. (Tr. 481-486). Moreover, although Dr. Potluri assessed Plaintiff's GAF to be 55 on July 9, 2010, he noted that her highest GAF in the past year was 50. (Tr. 481). The ALJ stated that "significant weight is given to the global

---

[26]See Footnote 25 above.

42

assessments of functioning of 50-55." (Tr. 23). But, it is "not clear that the administrative law judge understood the significance of a GAF score of 50. As noted, such a score represents serious impairment in social and occupational functioning, including an ability to keep a job." Diaz v. Astrue, 2009 U.S. Dist. LEXIS 131974, *22 (M.D. Pa. 2009) (Muir, J.) (finding that the ALJ "does not adequately explain how she could accept the GAF score of 50 but then find that [the claimant] has the ability to engage in substantial gainful work activity"); Baughman v. Astrue, 2009 U.S. Dist. LEXIS 75999, *10 (W.D. Pa. 2009) (determining that a GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social or occupational functioning, such as the ability to keep a job). Consequently, the ALJ erroneously afforded little weight to Dr. Potluri's opinion.

For all the reasons discussed herein, the weight afforded to the medical source opinions was in error and the matter will be remanded for a new RFC assessment.

## C. Dr. Copenhaver

Plaintiff objects to the Magistrate Judge's finding that the ALJ's failure to mention the treatment records from Dr. Copenhaver was harmless. (Doc. 17, pp. 11, 13-14); see also (Doc. 18, pp. 10-12) (Defendant's response brief to Plaintiff's objections). She argues that although the "Magistrate Judge states that the records from Dr. Copenhaver are not extensive and that an ALJ does not have to discuss every item of relevant evidence in the record[,] Dr. Copenhaver's records, however, constitute an entire course of mental health treatment." (Doc. 17, p. 12). Plaintiff highlights that the ALJ commented at the first hearing that she had to have the therapy records. (Id.), citing (Tr. 46-48). Further, Plaintiff asserts that contrary to the Magistrate Judge's determination, that the ALJ's failure to discuss the records does not mean that the ALJ did not

review them, is in error because the ALJ's complete failure to mention the treatment records

renders it impossible for the court to determine whether or not the records were considered. (Id.).

This Court agrees. Although Defendant is correct that an ALJ need not reference every

relevant treatment note, see (Doc. 18, p. 10) (citing Fargnoli, 247 F.3d at 42), the ALJ

specifically stated, "I require the therapy records," and "I need the therapy records" (Tr. 47-48).

Nevertheless, the ALJ's decision completely fails to make any mention of Plaintiff's therapy with

Dr. Copenhaver, fails to include any citation to these records, and fails to even note that two

separate hearings were held, the sole reason for which was the absence of the therapy records at

the time of the first hearing. See (Tr. 18-26). It cannot be said that the notes were not extensive

when Dr. Copenhaver regularly treated Plaintiff several times a month for six (6) months and her

records cover fifteen (15) individual counseling sessions. See (Tr. 496-499, 542-564). Further,

Dr. Potluri's treatment plan for Plaintiff specifically included her continued therapy with Dr.

Copenhaver, indicating the importance of this treatment. See (Tr. 490-491, 494-495, 509-512).

As explained above, these records are also relevant to the extent they support the medical

opinions of Dr. Yelinek and Dr. Potluri, and contradict Dr. Rightmyer's assessment. See

Brownawell, 554 F.3d at 357 ("Evaluation of the medical evidence as a whole leads to the

conclusion that the ALJ's determination is not supported by substantial evidence.").

Accordingly, the ALJ should have discussed these records. See Irizarry, 233 Fed. Appx. at

192-93 (remanding because the ALJ did not discuss all of the relevant evidence).

"An error is 'harmless' when, despite the technical correctness of an appellant's legal

contention, there is also 'no set of facts' upon which the appellant could recover." Brown v.

Astrue, 649 F.3d 193, 195 (3d Cir. 2011). For all the reasons discussed herein, it cannot be said

that there are no set of facts upon which Plaintiff can recover. Accordingly, the matter will be remanded to the ALJ.

## CONCLUSION

The RFC assessment is not supported by substantial evidence. First, all the medical source opinions limited Plaintiff to work, if at all, in low social demand settings, but the ALJ did not include such a restriction in the RFC or explain her reasons for rejecting it. Second, although the ALJ's conclusions regarding past relevant work and her questions to the VE essentially limited Plaintiff to unskilled work, as did the findings of the state agency consultant to whom the ALJ afforded significant weight, the ALJ failed to include in the RFC a limitation to unskilled work. Moreover, the ALJ improperly afforded significant weight to a non-examining, non-treating source opinion over that of two examining physicians, including Plaintiff's treating physician. Importantly, Plaintiff's treating physician found several limitations that would exclude Plaintiff from performing/maintaining employment. Dr. Copenhaver's treatment records, which the ALJ erroneously failed to mention, support Plaintiff's complaints and the opinions of Dr. Yelinek and Dr. Potluri. The ALJ failed to adequately explain her reasons for rejecting contradictory medical evidence, and her findings are not supported by substantial evidence. Therefore, the matter will be remanded to the ALJ for a new RFC assessment, including a proper analysis of the weight owed to each medical source opinion.

A separate Order will be issued.

Date: December 5, 2014

**United States District Judge**